[No. D029464. Fourth Dist., Div. One. May 5, 1999.]

SOUTH BAY CHEVROLET, Plaintiff and Appellant, v.
GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant and
Respondent.

866

## Counsel

Hopkins & Sutter, F. Thomas Hecht, Michael A. Ficaro and John P. Ratnaswamy for Plaintiff and Appellant.

Kirkland & Ellis, Chaim T. Kiffel, Claire P. Murphy, Steven C. Florsheim and Melissa D. Ingalls for Defendant and Respondent.

## Opinion

**KREMER, P. J.**—Plaintiff South Bay Chevrolet appeals a judgment after court trial favoring defendant General Motors ·Acceptance Corporation

(GMAC) on South Bay's complaint for GMAC's alleged unfair business practices violating Business and Professions Code[1] section 17200.[2] Asserting GMAC engaged in unfair business practices as a matter of law, South Bay contends the court erred in not granting South Bay judgment on its individual claim under section 17200. South Bay also contends the court erred in granting GMAC's motion for judgment under Code of Civil Procedure section 631.8 on South Bay's "private attorney general" claim under section 17200. Further, South Bay asserts various evidentiary errors, attacks the denial of its summary judgment motion, and challenges the cost award to GMAC. We affirm the judgment.

I

INTRODUCTION

GMAC provided short-term loans to finance automotive dealership South Bay's purchases of vehicles for resale. Consistent with industry practice, GMAC calculated interest on such loans based upon a 360-day year (the 365/360 method).

South Bay filed this lawsuit alleging GMAC violated section 17200 by using the 365/360 interest calculation method assertedly "without specific contractual authorization and disclosure." South Bay contended GMAC's use of such "unlawful, unfair, deceptive and misleading" method resulted in interest overcharges. South Bay also sought to proceed against GMAC under section 17200 on a private attorney general claim on behalf of all California automotive dealerships receiving similar financing from GMAC. Under Code of Civil Procedure section 631.8, the superior court granted judgment favoring GMAC on South Bay's private attorney general claim on the ground that "mini-trials" would be necessary with respect to each California GMAC-financed dealership due to various uniquely individual questions of fact. After trial, the court also granted judgment favoring GMAC on South Bay's individual claim under section 17200. Based upon substantial evidence that at relevant times South Bay knew GMAC was using the 365/360 method, the court found GMAC's use of that method did not violate section 17200. In effect, the court concluded that South Bay failed to prove that GMAC engaged in such challenged business practice without contractual authorization or disclosure.

---

[1] All statutory references are to the Business and Professions Code unless otherwise specified.

[2] Section 17200 defines "unfair competition" to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising" under section 17500.

California statutory and case law recognizes that under certain circumstances use of the 365/360 method may be misleading. However, South Bay knew and expected from the outset of its relationship with GMAC that such method would be used. Further, section 17200 is directed toward protecting the general public, not automotive dealerships aware of GMAC's use of the 365/360 method. Hence, we affirm the judgment.

II

FACTS

We state the facts and reasonable inferences in the light most favorable to GMAC as respondent. (*Bickel* v. *City of Piedmont* (1997) 16 Cal.4th 1040, 1053 [68 Cal.Rptr.2d 758, 946 P.2d 427]; *Clark* v. *City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1178, fn. 27 [56 Cal.Rptr.2d 223].)

A

*GMAC Finances Dealerships' Inventory*

GMAC operates a business of lending automotive dealerships money to finance their purchases of vehicles from General Motors Corporation (General Motors) and other entities. Such loans are short-term instruments outstanding for fewer than 90 days on average and are known in the industry as wholesale floor plan financing or wholesale floor plan loans.

A dealership initiating wholesale floor plan financing with GMAC enters into a wholesale security agreement giving GMAC a security interest in the vehicles being financed. However, the wholesale security agreement does not obligate a dealership to borrow any money from GMAC or require GMAC to lend the dealership any money. Further, the wholesale security agreement does not contain such specific loan terms as the amount of credit to be extended, the rate of interest, the method of interest calculation, repayment provisions, or the beginning or ending dates of the financing. Instead, the wholesale security agreement simply provides that a dealership receiving wholesale floor plan financing from GMAC is obligated to pay interest on the dealership's outstanding wholesale floor plan loans "at the rate per annum designated by GMAC from time to time and then in force under the GMAC Wholesale Plan." The GMAC wholesale plan incorporated into the wholesale security agreement is a set of various individualized features and programs—including the dealer wholesale credit account plan, the wholesale incentive plan, the wholesale floor plan protection program

and the wholesale installment sales program—communicated to the dealership orally or in writing throughout the course of the dealership's relationship with GMAC.[3] Before and after executing a wholesale security agreement, GMAC also communicates to a dealership orally and in writing other terms of its financing offer.

Thus, the wholesale security agreement is not the sole document setting forth the terms of the wholesale floor plan financing extended by GMAC but instead is only the first step leading to a series of individual lending agreements that commence independently when vehicles are actually floored. Until a vehicle is floored, no credit is extended. Each time a GMAC-financed dealership orders a vehicle from a manufacturer, the dealership enters into a separate lending agreement with GMAC. Such agreement obligates the dealership to pay GMAC interest on the outstanding balance for the floor-planned vehicles at a floating interest rate designated by GMAC from time to time. GMAC's interest rate floats in relation to a bank prime rate. When the prime rate fluctuates, GMAC's branch offices send dealerships rate change notices informing them of the new rate. Some of GMAC's branch offices refer to the rates quoted in those notices as "true rates," but other branches do not. GMAC also sends dealerships monthly billing statements detailing the interest charges accrued for each day a floor-planned vehicle is outstanding during the month. Interest due under each vehicle's floor plan loan agreement is listed separately.

On its wholesale floor plan loans to dealerships, GMAC charges "simple" or "true" (not compound) interest calculated using the 365/360 method. Under the 365/360 method, the per annum interest rate is multiplied by the outstanding loan balance and divided by 360 to determine a daily interest charge. The daily interest charge is then multiplied by the actual number of days the loan is outstanding to determine the total interest charges for the billing period.[4] Under the 365/360 method, the daily interest rate is constant

---

[3]Contrary to South Bay's contention, nothing in this factual record compels a conclusion the wholesale security agreement's incorporation of GMAC's wholesale plan was inadequate as a matter of law. (*Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 641 [223 Cal.Rptr. 838].) " '[A] contract may validly include the provisions of a document not physically a part of the basic contract. . . . "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] *But each case must turn on its facts.* [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties."* ' " (*Ibid.*, italics in original, underscoring added.)

[4]In *Chern v. Bank of America* (1976) 15 Cal.3d 866 [127 Cal.Rptr. 110, 544 P.2d 1310] (*Chern*), the Supreme Court described the 365/360 method "substantially as follows. An

for a given per annum interest rate.[5] Many banks and financial institutions commonly use the 365/360 method as their prevalent method of interest calculation for short-term commercial loans such as wholesale floor plan financing. Wholesale floor plan lenders other than GMAC also use the 365/360 method on loans made to dealerships.

Over the life of a wholesale floor plan loan, a dealership pays GMAC total interest equal to the amount listed on the monthly billing statements minus the amount of any wholesale credits, rebates, and subsidies the dealership may receive under the GMAC wholesale plan made a part of each of the series of wholesale floor plan loan agreements. Often constituting a significant component of a dealership's business, wholesale floor plan financing is generally overseen by the dealership's business manager or financial manager.

B

*South Bay and Its Principals*

In 1946 South Bay was founded as a Chevrolet dealership by the parents of its eventual principal, Travis Reneau. Reneau worked at South Bay from its founding, owned equity in the business beginning in the early 1950's, and served as the company's president from 1961 until 1986. South Bay's principal, David Ordway, joined the business as a 25 percent owner in 1981 and became its president in 1986. In January 1996, after suffering financial difficulties, South Bay sold its operations.

---

interest rate is selected and divided by 360 instead of 365 to determine the rate per day. This daily rate is multiplied by the number of days that the loan is outstanding. The result is the amount of interest the borrower must pay. To compute the amount due for a loan taken for a full 365-day year, this daily rate would, of course, be multiplied by 365. Under this method of computation, a *stated* interest rate of 9 percent calculated on the basis of a 360-day year . . . results in daily interest of .0025 percent (.09/360) and an actual annual rate of 9.125 percent (.0025 x 365). In contrast, if the daily rate applied is calculated on a 365-day year, a 9 percent annual rate results in approximately .00247 percent per day (.09/365). Thus, the shorter the period of time used in arriving at the stated interest rate, the higher the actual rate of daily interest and the greater the disparity between the stated rate and the actual annual interest rate." (*Id.* at p. 870, italics in original.)

[5]By contrast, under the 360/360 method of interest computation, the per annum interest rate is divided by 12 to determine the monthly rate, which remains constant for each month regardless of the number of days in the month. The daily rate is determined by dividing the constant monthly rate by the number of days in each particular month. As a result, the daily rate differs from month to month depending upon the number of days in each particular month. The trial court expressly found that South Bay understood GMAC was not using the 360/360 method.

## C

*South Bay's Course of Dealings With GMAC*

From its founding until the sale of its operations, South Bay received wholesale floor plan financing from GMAC except for the 1982-1986 period when Bank of America served as South Bay's wholesale floor plan lender. South Bay paid both of its lenders wholesale floor plan interest calculated using the 365/360 method.

South Bay averaged about $4 million in wholesale floor plan loans outstanding to GMAC. South Bay delegated to its business manager and support staff the responsibility for monitoring its wholesale floor plan financing. Before the early 1960's, GMAC did not send billing statements to dealerships. Instead, during those early years of the parties' relationship, South Bay's office manager calculated by hand the wholesale floor plan interest owing to GMAC on each vehicle under the 365/360 method.

In June 1986 South Bay entered into a wholesale security agreement with GMAC. GMAC's San Diego branch office that served South Bay had a regular practice of discussing its interest calculation method with a dealership within 24 hours after the dealership signed up for wholesale floor plan financing with GMAC. After commencement of financing, GMAC's sales staff also had the practice of explaining the calculations on wholesale floor plan loan billing statements. Consistent with those regular practices, GMAC's sales supervisor Helen Azevedo orally informed South Bay of its interest calculation methods soon after South Bay executed the June 1986 wholesale security agreement.

In September 1986 South Bay delegated to its business manager, Sue Fenn, and her staff the responsibility for overseeing South Bay's wholesale floor plan financing. South Bay's principals granted Fenn broad unfettered discretion to oversee the day-to-day operation of such financing. Fenn was specifically responsible for checking each wholesale floor plan financing billing statement from GMAC to ensure South Bay was not overcharged, reviewing all notices from GMAC about wholesale floor plan financing charges, and communicating with GMAC about those charges. South Bay's principal, Ordway, relied on Fenn to understand many aspects of the interest charges including the interest calculation method and to double-check each billing statement for accuracy. South Bay also "authorized and empowered" Fenn to execute "all documents or instruments including (without limiting the generality of the foregoing) promissory notes, acceptances, agreements, or any assignments thereof, in connection with any transaction between this

corporation [South Bay] and General Motors Acceptance Corporation under the GMAC Wholesale Plan."

Due to her earlier experience at another dealership, Fenn knew of the 365/360 method before becoming South Bay's business manager. Consistent with her expectation that GMAC would use the 365/360 method, Fenn employed such method in regularly spot-checking South Bay's billing statements for accuracy and reviewing materials provided by GMAC and General Motors containing explicit descriptions of interest computation using the 365/360 method. Such written materials included GMAC's monthly wholesale billing statements detailing separately the interest charges under each vehicle's wholesale floor plan loan agreement; GMAC's guides to wholesale billing statements;[6] and other documents relating to various wholesale floor plan financing programs.[7]

## III

### SUPERIOR COURT PROCEEDINGS

On May 23, 1995, South Bay filed this lawsuit against GMAC on behalf of itself, the general public of California, and GMAC's California wholesale floor plan borrowers. South Bay alleged GMAC violated section 17200 by using the 365/360 method to calculate interest owing from automobile dealerships "without specific contractual authorization and disclosure."[8] South Bay's complaint also included statewide class action allegations.

In May 1996, after each party had unsuccessfully sought summary judgment, the parties stipulated that in its representative capacity South Bay was seeking "to pursue its claims solely and exclusively as a private attorney general on behalf of the general public of the state of California, pursuant to

---

[6]GMAC's 1994 guide, distributed in October 1994, expressly disclosed use of the 365/360 method.

[7]In connection with various transactions other than GMAC loans, beginning no later than May 1984 South Bay's principals, Reneau and Ordway, signed loan documents explicitly referring to and accurately describing the 365/360 method. Upon her employment by South Bay beginning in September 1986, Fenn was responsible for drafting promissory notes reflecting more than 12 intracorporate loans between South Bay and its principals, Reneau and Ordway. Fenn also had responsibility for paying and receiving interest on the intracorporate notes. As instructed by Reneau and Ordway, Fenn used the 365/360 method to compute interest on those notes consistent with the notes' express provisions specifying that the interest rate would be pegged to the "GMAC flooring rate" or that the interest would be paid "as billed from GMAC."

[8]The superior court concluded, and the parties do not dispute, that the four-year statute of limitations on South Bay's section 17200 claim commenced running on May 23, 1991. Thus, the loans at issue in this lawsuit were those entered into during such four-year period.

California Business and Professions Code section 17200 et seq." In accord with the stipulation, the court struck South Bay's class action allegations without prejudice.

In May 1997 the matter came on for court trial. At the close of South Bay's case, the court granted GMAC's motion for judgment under Code of Civil Procedure section 631.8 on South Bay's private attorney general claim under section 17200.

After trial, the court found for GMAC on South Bay's individual claim under section 17200 and entered judgment favoring GMAC. The court also awarded GMAC $83,005.54 costs. South Bay appeals.

IV

DISCUSSION

A

*South Bay's Individual Claim*

South Bay contends the trial court should have concluded South Bay was entitled to judgment as a matter of law on its individual claim against GMAC under section 17200. South Bay asserts undisputed evidence established that although the parties' wholesale security agreement required GMAC to quote a "per annum" interest rate and GMAC's interest rate notices quoted annual interest rates, GMAC violated section 17200 by calculating interest under the 365/360 method without disclosing it used such method or that such method resulted in GMAC charging effective annual interest rates higher than its quoted rates. However, as we shall explain, the court's findings favoring GMAC on South Bay's individual claim were supported by substantial evidence and reasonable inferences. (*Bickel* v. *City of Piedmont, supra,* 16 Cal.4th at p. 1053; *Clark* v. *City of Hermosa Beach, supra,* 48 Cal.App.4th at p. 1178, fn. 27.) In effect, South Bay improperly seeks reweighing on appeal of conflicting evidence presented at trial.

1

*Trial Court's Statement of Decision*

In granting judgment favoring GMAC on South Bay's individual claim under section 17200, the trial court expressly rejected South Bay's allegation

that without contractual authorization or disclosure GMAC quoted one interest rate on its wholesale floor plan loans and then charged another rate. Instead, the court concluded GMAC's use of the 365/360 method to calculate interest in the context of its wholesale floor plan financing did not violate section 17200. Specifically, the court stated, "GMAC's use of the method is not unlawful, unfair, untrue, deceptive, misleading or fraudulent" as to South Bay; and GMAC's communications about interest rates and charges did not constitute misleading advertising under section 17500.

The following findings set forth in the court's statement of decision supported the court's conclusions:

Each separate wholesale floor plan loan extended to South Bay by GMAC was governed by the terms of the parties' wholesale security agreement, terms specified in oral and written communications between South Bay personnel and GMAC, terms contained in various other written materials GMAC provided to South Bay, and terms established through the parties' course of dealings;

South Bay received from GMAC monthly billing statements, guides, a disclosure about the dealer wholesale credit account program, bulletins from Chevrolet, and other documents permitting a reasonable dealership to determine or confirm that GMAC was using the 365/360 method;

Before entering into the disputed wholesale floor plan loans, South Bay knew that GMAC would use the 365/360 method to calculate interest; specifically, during the entire period of her employment with South Bay from September 1986 through mid-1994, South Bay's business manager and corporate agent Fenn had knowledge of the practice; and since this was a suit by corporate dealership South Bay, its agent Fenn's knowledge related to her wholesale financing area of responsibility was imputed to South Bay;

Both South Bay and GMAC agreed and understood that GMAC would quote interest rates based on a 360-day year rather than a 365-day year and calculate interest charges using the 365/360 method; the contracts for all such loans thus authorized GMAC's use of the 365/360 method; South Bay realized the impact of such method over a period of 365 or 366 days; thus, in requesting and accepting each of its disputed wholesale floor plan loans, South Bay expected and understood that GMAC would use the 365/360 method; references in the wholesale security agreement and other GMAC materials to "per annum" interest rate and "true interest" were not inconsistent with use of the 365/360 method in the context of GMAC's wholesale

floor plan financing; and in South Bay's wholesale "floor plan loan contracts, GMAC was authorized to use the 365/360 method and references to 'per annum' interest were, by agreement of the parties, made with reference to a 360-day interest year."

South Bay was not likely to be deceived by GMAC's business practice of using the 365/360 method to calculate interest on wholesale floor plan loans since both parties understood and expected the use of such method; and South Bay's "knowledge, experience and communications with GMAC" rendered it "inconceivable" that South Bay "would or could have been deceived" by GMAC's business practice of using such method on the disputed loans.

2

*The Law*

Section 17200 "is not confined to anticompetitive business practices, but is also directed toward the public's right to protection from fraud, deceit, and unlawful conduct. [Citation.] Thus, California courts have consistently interpreted the language of section 17200 broadly." (*Hewlett* v. *Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 519 [63 Cal.Rptr.2d 118].) " 'The statute imposes strict liability. It is not necessary to show that the defendant intended to injure anyone.' " (*Id.* at p. 520, citing *State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229].)[9] To state a claim under section 17200, a plaintiff "need not plead and prove the elements of a tort. Instead, one need only show that 'members of the public are likely to be deceived.' " (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545], citing *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; *Chern, supra,* 15 Cal.3d at p. 876.) "Allegations of actual deception, reasonable reliance, and damage are unnecessary." (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* at p. 211; see also *Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 839 [33 Cal.Rptr.2d 438].) Further, the statute authorizes "courts to order restitution without individualized proof of deception, reliance, and injury if necessary to prevent the use or employment of an

_____

[9]Other language in *State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at page 1104, has been disapproved by the Supreme Court in a discussion expressly limited to the context of "an action by a competitor alleging anticompetitive practices." (*Cel-Tech Communications, Inc.* v. *Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187, & fn. 12 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

unfair practice." (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1267; see also *Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442, 453 [153 Cal.Rptr. 28, 591 P.2d 51] (*Fletcher*).) Because section 17200's definition is "disjunctive," the statute is violated where a defendant's act or practice is unlawful, unfair, fraudulent or in violation of section 17500. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1102.)

### 3

### *Analysis*

South Bay contends GMAC's business practice of using the 365/360 method to calculate interest on wholesale floor plan loans to California dealership South Bay violated section 17200 as a matter of law. Specifically, South Bay asserts GMAC's wholesale security agreement and interest rate notices did not disclose GMAC's use of the 365/360 method or that such use would result in GMAC's charging effective annual interest rates higher than its quoted rates, to wit, an extra five or six days' interest in each calendar year. Hence, South Bay concludes GMAC's practices violated all four prongs of section 17200 in that they were assertedly "unlawful," "unfair," "fraudulent," and in violation of section 17500.

The trial court correctly noted that to recover under section 17200, South Bay had the burden to establish GMAC's conduct was unlawful, unfair, fraudulent or in violation of section 17500. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1102.) The trial court also correctly noted that to recover under the third or fourth prong of section 17200, South Bay had the burden to establish GMAC engaged in a business practice "likely to deceive" the reasonable consumer to whom the practice was directed. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1267; *Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 211; *Chern, supra,* 15 Cal.3d at p. 876.) Applying those standards to this record, the trial court properly concluded South Bay failed to prove GMAC's use of the 365/360 method to calculate interest on wholesale floor plan loans made to South Bay violated section 17200. Although South Bay's complaint alleged that GMAC violated section 17200 by using the 365/360 method to calculate interest owing from South Bay "without specific contractual authorization and disclosure," the record contained substantial evidence indicating that from 1991 to 1995, when requesting the disputed wholesale floor plan loans, South Bay knew, understood, agreed and expected that GMAC would use the 365/360 method to calculate the interest.

. (a)

*South Bay's Knowledge of GMAC's Use of 365/360 Method*

██ Specifically, evidence demonstrated that South Bay's business man-
ager Fenn knew before and during the entire period of her employment at
South Bay that GMAC used the 365/360 method to calculate interest on
wholesale floor plan loans. Further, contrary to South Bay's contention, the
evidentiary record supported the trial court's finding that South Bay was
bound by Fenn's knowledge. South Bay asserts evidence indicated Fenn was
never a principal, owner or shareholder of South Bay; Fenn had no authority
to choose South Bay's financing, switch South Bay's financing or sign
guaranties on South Bay's behalf; and Fenn's job did not include responsi-
bility for the terms of South Bay's financing. However, evidence indicated
Fenn's job in fact included responsibility for the terms of South Bay's
wholesale floor plan financing with GMAC. Indeed, South Bay's principals
granted Fenn broad discretion to oversee the day-to-day operations of the
wholesale floor plan financing including specifically the responsibility to
check each wholesale floor plan financing billing statement from GMAC.
Consistent with her responsibility for implementing all the terms of the
wholesale floor plan financing, Fenn reviewed the correctness of GMAC's
monthly billing statements and understood how GMAC computed interest.
Moreover, evidence indicated that Fenn's task of checking the accuracy of
GMAC's billing statements was not possible without knowing GMAC's
method of interest calculation. Evidence also indicated South Bay expressly
authorized and empowered Fenn to execute all agreements in connection
with any transaction between South Bay and GMAC under GMAC's whole-
sale plan. South Bay's principal Ordway testified he "relied" on Fenn to
understand many aspects of the interest charges including the calculation
method. Additionally, South Bay's principals, Ordway and Reneau, testified
that when South Bay received disclosures from GMAC about its interest
calculation method, they did not read those disclosures but instead relied on
Fenn to do so. In sum, on this evidentiary record the trial court reasonably
concluded South Bay could not be deceived since in her capacity as South
Bay's agent vested with responsibility for overseeing its wholesale floor plan
financing, Fenn received adequate disclosures of GMAC's use of the 365/
360 interest calculation method and indeed had actual knowledge of its use.
(Civ. Code, § 2332;[10] *Smith* v. *Workers' Comp. Appeals Bd.* (1984) 152

---

[10]Civil Code section 2332 provides: "As against a principal, both principal and agent are
deemed to have notice of whatever either has notice of, and ought, in good faith and the
exercise of ordinary care and diligence, to communicate to the other."

Cal.App.3d 1104, 1110 [199 Cal.Rptr. 881];[11] *Heggblade-Marguleas-Tenneco, Inc.* v. *Sunshine Biscuit, Inc.* (1976) 59 Cal.App.3d 948, 956 [131 Cal.Rptr. 183];[12] 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 101, pp. 98-99.[13])

The evidentiary record also supported the superior court's finding that GMAC's monthly billing statements, wholesale billing guides, and other wholesale plan disclosures provided South Bay with all information necessary to determine that the 365/360 method of interest calculation was being used. Indeed, South Bay's expert Richard Ross acknowledged the wholesale security agreement lacked essential lending terms; several GMAC and General Motors documents expressly disclosed the 365/360 method; and GMAC's billing statements reflected use of such method.

In sum, the record amply supported the trial court's finding that when obtaining the disputed loans from GMAC, South Bay knew, understood, agreed and expected that GMAC would calculate interest using the 365/360 method.

(b)

*No Unlawful Business Practice*

■ " 'The "unlawful" practices prohibited by . . . section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. [Citation.] It is not necessary that the predicate law provide for private civil enforcement. [Citation.] As our Supreme Court put it, section 17200 "borrows" violations of other laws and treats them as unlawful practices independently actionable under section 17200 et seq.' " (*Hewlett* v. *Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at pp. 531-532, citing *Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at pp. 838-839; see also *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730]; *People* v. *McKale* (1979) 25

---

[11]In *Smith* v. *Workers' Comp. Appeals Bd., supra,* 152 Cal.App.3d 1104, the appellate court stated: "Corporate employers are charged with knowledge of and responsibility for all of the relevant acts of all their agents done within the scope of employment." (*Id.* at p. 1110.)

[12]In *Heggblade-Marguleas-Tenneco, Inc.* v. *Sunshine Biscuit, Inc., supra,* 59 Cal.App.3d 948, the appellate court stated an employee's knowledge of a trade or custom in the industry was imputed to the employer. (*Id.* at p. 956.)

[13]"The test of imputed notice is whether the facts *concern the subject matter* of the agency and are *within its scope.* Generally speaking, notice is imputed to the principal of any facts relating to the subject matter of the agency of which the agent acquires knowledge or notice while acting as such within the scope of his authority." (2 Witkin, Summary of Cal. Law, *supra,* Agency and Employment, § 101, pp. 98-99, italics in original.)

Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]; *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299 [22 Cal.Rptr.2d 20].)

■ South Bay contends for purposes of section 17200, GMAC's business practice of calculating interest under the 365/360 method was "unlawful" as contrary to section 17500, Civil Code section 1916,[14] Government Code section 6803,[15] contract law and public policy. Specifically, asserting GMAC's wholesale security agreement's requirement that GMAC charge interest at a "per annum" rate barred GMAC from using the 365/360 method since "per annum" literally means a 365-day or 366-day year (*Chern, supra,* 15 Cal.3d at p. 876), South Bay contends GMAC breached such contractual requirement by not disclosing that GMAC used the 365/360 method or that such method would result in GMAC's charging effective annual interest rates higher than its quoted rates. Similarly, South Bay contends GMAC engaged in the assertedly unlawful practice of breaching its interest rate notices that often quoted annual interest rates as "% true" or "true interest." However, South Bay's contentions are without merit.

As the trial court properly noted in its statement of decision, since California has no law or regulation requiring a lender to use a 365-day year in computing interest on commercial loans, GMAC's use of the 365/360 method was not unlawful per se.[16] Further, South Bay has not identified any California or federal law requiring GMAC to use a 365-day year instead of the 360-day year in quoting annual interest rates on wholesale floor plan loans or requiring GMAC to specify the calculation method in the wholesale security agreement. Indeed, South Bay specifically declines to argue that use

---

[14]Civil Code section 1916 provides: "When a rate of interest is prescribed by a law or contract, without specifying the period of time by which such rate is to be calculated, it is to be deemed an annual rate."

[15]Government Code section 6803 provides in relevant part: " 'Year' means a period of 365 days . . . ."

[16]The trial court properly found Civil Code section 1916 and Government Code section 6803 were inapplicable to the parties' transaction and did not prohibit lender GMAC from using the 365/360 method. Civil Code section 1916's reference to "annual" rate does not specify the meaning of the parties' wholesale security agreement's term "per annum" with respect to the number of days used in an interest calculation method. Moreover, with respect to Government Code section 6803, an appellate court has observed that ". . . *the term 'year' may be flexible in meaning in accordance with the context in which it is employed.* 'Ordinarily, the term "year," when used in a statute, means a period of 365 days. But its meaning in all cases is dependent on the subject matter and the connection in which it is used. It may mean a period of 12 months, commencing on a day other than January 1, or it may mean a political year or a period between two elections, a year of office, a school year, a fiscal year or excise year, a year of age, or a theatrical season. . . .' " (*Davis* v. *Thayer* (1980) 113 Cal.App.3d 892, 903, fn. 1 [170 Cal.Rptr. 328], italics added.)

of the 365/360 method is per se unlawful in California. Instead, South Bay contends under the circumstances here that GMAC's business practice of not disclosing its use of the 365/360 method or such method's results was unlawful in light of the provision in the parties' wholesale security agreement requiring GMAC to charge interest at a per annum rate. (*Fletcher, supra,* 23 Cal.3d 442; *Chern, supra,* 15 Cal.3d 866.) However, as discussed, ample evidence demonstrated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the 365/360 method to calculate interest. Further, as the trial court properly found, GMAC's use of the 365/360 method was not made unlawful merely because GMAC's wholesale security agreement and its bulletins advising South Bay of interest rate changes did not specify GMAC's use of such method. As the court correctly concluded, substantial evidence of GMAC's overall communications and course of dealing with South Bay indicated GMAC's use of the 365/360 method was not unlawful as breaching the parties' contract or otherwise. (See *Chern, supra,* at p. 874.)[17]

Moreover, South Bay's experts, Ross and Colwell, acknowledged the 365/360 method was commonly used in calculating interest on commercial loans, whether regular loans or wholesale floor plan financing, and use of a 360-day year was assumed in short-term loans. Accounting and finance textbooks also described the 365/360 method as the common, usual and customary method for calculating daily interest. A dictionary defined simple interest as interest paid or computed often on the assumption each day constitutes 1/360th of a year. South Bay's former business manager Fenn characterized the 365/360 method as "standard in the business, in the industry. It's a norm. . . . I would think anyone who is in the business would be knowledgeable about it." South Bay's expert Ross also acknowledged there was nothing inappropriate about a lender calculating interest under the 365/360 method if the borrower was made aware of such practice. Ross also acknowledged GMAC's 1989 guide to its wholesale billing statements would lead a dealership "to believe that it's a 365/360 when read in conjunction with the Wholesale Security Agreement . . . you could discover that this is really a 365/360."

Finally, South Bay contends the Supreme Court has twice held that a lender's improper use of the 365/360 method of interest calculation violates section 17500. (*Fletcher, supra,* 23 Cal.3d 442; *Chern, supra,* 15 Cal.3d 866.) South Bay asserts the trial court unsuccessfully sought to distinguish

---

[17]"It is well established that '. . . separate written instruments between the same parties and relating to the same subject matter . . . are to be construed together as one transaction . . . .' " (*Chern, supra,* 15 Cal.3d at p. 874.)

those cases on the theory South Bay did not prove any likelihood of deception. Specifically, South Bay faults the trial court for seeking to distinguish *Chern* as involving "isolated loan transactions governed by single loan contracts where there was no prior extended course of dealing or communications."[18] Similarly, South Bay faults the trial court for attempting to distinguish *Fletcher* on the ground that South Bay's lawsuit involved "an ongoing relationship between sophisticated business entities and a lender with many new loans being initiated each month."[19] However, contrary to South Bay's suggestion, nothing in *Chern* or *Fletcher* established an absolute rule precluding wholesale floor plan lenders from ever using the 365/360 method of interest calculation. As we shall explain, those cases are properly distinguishable as involving loans made to individual consumers, not to a financially sophisticated automotive dealership with knowledge of the lender's use of the 365/360 method in the parties' ongoing relationship.[20]

---

[18]In its statement of decision, the trial court noted that although in *Chern, supra,* 15 Cal.3d 866, the Supreme Court "found that a bank's practice of quoting per annum rates while using a 360-day year was likely to deceive the bank's customers, that case involved a different situation from the one here. First, *Chern* involved isolated loan transactions governed by single loan contracts where there was no prior extended course of dealing or communications. Second, in *Chern* the lender failed to offer evidence that borrowers expected anything other than rates quoted based on a 365-day year. In contrast, here there is abundant 'evidence to the contrary' which demonstrates that South Bay and other dealerships—as opposed to the 'general public' to whom the lender in *Chern* offered loans—knew and expected the use of the 365/360 method in their wholesale floor plan financing and that the 365/360 method was a term of GMAC's offer to make the wholesale loans at issue. Third, while *Chern permits* a Court to award injunctive relief without plaintiff showing lack of knowledge, it does not *require* this Court to award any relief where the evidence demonstrates that there was no deception or likelihood of deception. Because GMAC has shown that its overall practice of computing interest and quoting interest charges is not likely to deceive a reasonable dealership borrower such as South Bay, the case at hand is distinguishable from *Chern*." (Italics in original.)

[19]In its statement of decision, the trial court noted that *Fletcher, supra,* 23 Cal.3d 442, "does not support a ruling in plaintiff's favor for the same reasons as *Chern*. *Fletcher* is distinguishable because it involved single transactions governed by single contracts, while this case involves an ongoing relationship between sophisticated business entities and a lender with many new loans being initiated each month. In addition, here each of the loans at issue was requested after South Bay had knowledge of GMAC's lending practices and methods of calculation. *Fletcher* holds that a Court *may afford* a remedy to those who had no information that a lender was using the 365/360 method in a deceptive fashion, but it does not *require* the Court to award relief where a party knows that interest is to be computed using the 365/360 method or where a business practice is not likely to deceive." (Italics in original.)

[20]In *Lewis* v. *Prudential-Bache Securities, Inc.* (1986) 179 Cal.App.3d 935 [225 Cal.Rptr. 69] (*Lewis*), also cited by South Bay, we stated in dictum that ". . . the continued use by brokerage firms of the 360-day year may have important public policy implications . . . ." (*Id.* at p. 942.) Similar to *Fletcher, supra,* 23 Cal.3d 442, and *Chern, supra,* 15 Cal.3d 866, *Lewis* involved consumer loans and is thus distinguishable from this lawsuit by South Bay.

With respect to its individual claim against GMAC under section 17200, South Bay's reliance on *Chern, supra,* 15 Cal.3d 866, is unavailing. In *Chern,* after quoting an interest rate in its initial dealings with potential borrowers, the defendant bank quoted a higher actual rate based on use of the 365/360 method when ultimately closing a loan with a customer. (*Id.* at p. 874.) The plaintiff borrower brought an action against the bank on behalf of herself and a class of similarly situated persons seeking damages on two theories, to wit, breach of contract and the making of false or misleading statements with respect to interest rate calculation (§ 17500). (*Chern, supra,* at pp. 869-871, 873.) The plaintiff also sought injunctive relief under section 17500. (*Chern, supra,* at pp. 870-871, 875.) In affirming a defense summary judgment on the plaintiff's claim for damages for breach of contract, the Supreme Court stated such claim was defeated by the plaintiff's knowledge at the time she entered into the loan contract that the interest rate was based on the 365/360 method. (*Id.* at p. 873.) Rejecting the plaintiff's contention that she should be permitted to represent the class on its breach of contract claim despite her own inability to prevail on the merits, the Supreme Court also upheld dismissal of the class action claim for breach of contract for want of a proper representative. (*Id.* at p. 874.) Hence, contrary to South Bay's contention, *Chern,* is not inconsistent with the trial court's holding favoring GMAC on South Bay's individual claim under section 17200 for the assertedly "unlawful" business practice of using the 365/360 method of interest calculation allegedly "without specific contractual authorization and disclosure." Indeed, similar to the plaintiff's breach of contract claim in *Chern,* South Bay's individual "unlawfulness" claim based on lack of contractual authorization and disclosure must fail because, as discussed, at the time of entering into the disputed loan agreements South Bay knew, understood, agreed and expected that GMAC would use the 365/360 method. (15 Cal.3d at pp. 873-874.) Moreover, this case is factually distinguishable from *Chern* in that GMAC entered into transactions not with members of the general public but instead with financially sophisticated dealership South Bay, provided notice of its use of the 365/360 method before South Bay requested the disputed loans, and did not quote an interest rate on any of those loans until after South Bay had learned GMAC's rates were annualized over a 360-day year.[21]

With respect to its individual claim against GMAC under section 17200, South Bay's reliance on *Fletcher, supra,* 23 Cal.3d 442, is also unavailing. In

---

[21]Although affirming the defense summary judgment on plaintiff borrower's breach of contract claim in *Chern, supra,* 15 Cal.3d 866, the Supreme Court reversed the defense summary judgment on plaintiff's claim for injunctive relief under section 17500. (*Chern, supra,* at pp. 876-877.) The Supreme Court stated that "the practice of computing interest quoted as a 'per annum' rate on the basis of a 360-day year is likely to deceive the public. . . . [Citations.] As commonly understood, a year has either 365 or 366 days. [Citation.] *In the absence of evidence to the contrary,* we must assume that the public is likely

*Fletcher,* the plaintiff borrower on behalf of himself and other similarly situated borrowers sought restitution of sums obtained by the defendant bank through the use of the 365/360 method and damages for breach of contract and violation of section 17200 et seq. (*Fletcher, supra,* at p. 446.)[22] The Supreme Court concluded that ". . . although the trial court properly refused to permit plaintiff's claim for breach of contract to proceed as a class action, the trial court, resting on an erroneous legal assumption, improperly refused to permit plaintiff's claim of an unfair trade practice to proceed as a class action." (*Ibid.*) The Supreme Court stated: "In the initial portion of our *Chern* decision, we held that while a borrower who had no prior knowledge of the 360-day year computation practice might mount a valid breach of contract claim against the bank, plaintiff, who *had* full knowledge of the meaning of the 'per annum' interest rate in the contract provision, could not prevail in such a breach of contract action. Moreover, since plaintiff herself could muster no valid contract claim, we concluded that she could not properly pursue a class action on behalf of those borrowers who did not have knowledge of the banking practice." (*Fletcher, supra,* at p. 448.) Hence, although when entering the loan transaction with the defendant bank the plaintiff in *Fletcher* did not know that interest would be calculated using the 365/360 method, the Supreme Court nonetheless concluded that the trial court acted within its discretion in declining to permit the contract claim to proceed as a class action. (*Id.* at pp. 448-449.) The Supreme Court stated: "We recognize that proof of each individual borrower's lack of knowledge may be required to sustain a recovery under the breach of contract theory." (*Id.* at p. 446.) Hence, contrary to South Bay's contention, *Fletcher* is not inconsistent with the trial court's holding favoring GMAC on South Bay's individual claim under section 17200 for the assertedly "unlawful" business practice of using the 365/360 method of interest calculation allegedly "without specific contractual authorization and disclosure." Indeed, in *Fletcher,*

---

to understand that a 'per annum' rate is an annual rate based on a 365-day calendar year. The fact that it may be 'customary' business practice within the banking community to quote interest rates on the basis of a 360-day year does not *necessarily* establish that the practice is not misleading to the general public with whom defendant deals." (*Id.* at p. 876, italics added.) Thus, the Supreme Court concluded that ". . . the practice of quoting as a 'per annum' rate interest computed on the basis of a 360-day year is likely to mislead and deceive a bank's potential borrowers, and that if, as alleged, defendant has adopted such practice it constitutes false and misleading advertising under Business and Professions Code section 17500. Accordingly, injunctive relief should be available to restrain further conduct of this nature on defendant's part." (*Ibid.*)

[22]In *Fletcher, supra,* 23 Cal.3d 442, the Supreme Court referred to its earlier determination in *Chern, supra,* 15 Cal.3d 866, that ". . . the industry-wide banking practice of computing so-called 'per annum' interest rates on the basis of a 360-day year constituted an unfair trade practice under Business and Professions Code section 17500." (*Fletcher, supra,* at pp. 445, 454.) In *Fletcher,* the Supreme Court also referred to its conclusion in *Chern* that ". . . the practice as such, could, and should, be enjoined." (*Fletcher, supra,* at p. 445.)

the Supreme Court effectively reaffirmed the portion of *Chern, supra,* 15 Cal.3d 866, that a plaintiff, such as South Bay, with full knowledge of the meaning of the per annum interest rate in a contract provision, may not prevail in a breach of contract action. (*Fletcher, supra,* at pp. 446, 448.) As discussed, although styled as a cause of action under section 17200, the crux of South's Bay's individual unlawfulness claim against GMAC was the alleged lack of contractual authorization and disclosure, a claim that must fail because at the time of entering into the disputed loan agreements South Bay knew, understood, agreed and expected that GMAC would use the 365/360 method. (*Fletcher, supra,* at pp. 446, 448.)[23]

In sum, the trial court properly concluded South Bay did not establish that GMAC engaged in an unlawful business practice under section 17200.

(c)

*No Unfair Business Practice*

■ "The 'unfair' standard, the second prong of section 17200" offers "an independent basis for relief." (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1103.) "This standard is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . .' " (*Id.* at pp. 1103-1104; see also *Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at p. 839; *Motors, Inc.* v. *Times Mirror Co.* (1980) 102 Cal.App.3d 735, 740 [162 Cal.Rptr. 543].) In *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509 [206 Cal.Rptr. 164, 53 A.L.R.4th 661], we concluded ". . . an 'unfair' business practice occurs when it offends an

---

[23]Although affirming the portion of the trial court order dismissing the class action for breach of contract in *Fletcher, supra,* 23 Cal.3d 442, the Supreme Court reversed the portion of the order dismissing the class action for restitution under section 17535. (*Fletcher, supra,* at p. 455.) The Supreme Court stated that "*once an unfair trade practice has been established, a trial court has discretion to order restitution without requiring proof of each class member's lack of knowledge as to that unfair trade practice.*" (*Id.* at p. 449, italics in original, underscoring added.) The trial court possesses such authority "in order to preclude an entity which has engaged in an unlawful trade practice from improperly profiting from its wrongdoing." (*Id.* at p. 446.)

established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." (*Id.* at p. 530.)[24] "In general the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices. . . .' " (*Klein* v. *Earth Elements, Inc.* (1997) 59 Cal.App.4th 965, 970 [69 Cal.Rptr.2d 623].) However, the "unfairness" prong of section 17200 "does not give the courts a general license to review the fairness of contracts . . . ." (*Samura* v. *Kaiser Foundation Health Plan, Inc., supra,* 17 Cal.App.4th at p. 1299, fn. 6.)

■ South Bay characterizes as "unfair" GMAC's asserted systematic breaching of the wholesale security agreement to the injury of borrowers by using the term "per annum" in such agreement, quoting annual interest rates, and then using without disclosure the 365/360 method to charge higher effective interest rates. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1104.) However, as discussed, substantial evidence indicated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the 365/360 method to calculate interest. As also discussed, South Bay's expert Ross acknowledged there was nothing inappropriate about a lender calculating interest under the 365/360 method if the borrower was made aware of such practice. Thus, based on this evidentiary record, the trial court properly rejected the theory alleged in South Bay's complaint that without contractual authorization or disclosure GMAC quoted one interest rate on its wholesale floor plan loans and then charged another rate. Instead, the court concluded GMAC's use of the 365/360 method to calculate interest in the context of its wholesale floor plan financing was contractually authorized and did not violate section 17200. Specifically, the court found GMAC's use of the 365/360 method was not "unfair" as to South Bay. Further, as noted, evidence indicated the 365/360 method of interest calculation was widely used, particularly in wholesale floor plan financing and expected by dealerships. Moreover, the 365/360 method was a reasonable business practice because GMAC and General Motors provided interest credits to dealerships using such method, use of the method promoted efficiency for dealerships by permitting easy comparison of rates, and dealerships were not harmed by its use since the competitive nature of the market ensured they would pay no more in interest than if another interest calculation method were used.

---

[24]This definitional language in *People* v. *Casa Blanca Convalescent Homes, Inc., supra,* 159 Cal.App.3d 509, has been disapproved by the Supreme Court as "too amorphous" and as providing "too little guidance to courts and businesses" in a case involving an action by a competitor alleging anticompetitive practices. (*Cel-Tech Communications, Inc.* v. *Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 185.) However, the Supreme Court's discussion of such language was expressly limited to the competitor context and specifically stated not to relate to "actions by consumers." (*Id.* at p. 187, fn. 12.)

Hence, any harm to dealerships from use of the 365/360 method was outweighed by GMAC's reasons, justification and motives for its use. (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* at pp. 1103-1104; *Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at p. 839; *Motors, Inc.* v. *Times Mirror Co., supra,* 102 Cal.App.3d at p. 740.)

In sum, the trial court properly concluded South Bay did not establish that GMAC engaged in an unfair business practice under section 17200.

(d)

*No Fraudulent Business Practice*

■ The " 'fraud' contemplated by section 17200's third prong bears little resemblance to common law fraud or deception. The test is whether the public is likely to be deceived." (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* 45 Cal.App.4th at p. 1105, citing *Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 211.) Stated otherwise, " 'Fraudulent,' as used in the statute, does not refer to the common law tort of fraud but only requires a showing members of the public ' "are likely to be deceived." ' " (*Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at p. 839, citing *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1267; see also *Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1200-1201 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) "This means that a section 17200 violation, unlike common law fraud, can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage." (*State Farm Fire & Casualty Co.* v. *Superior Court, supra,* at p. 1105; see also *Klein* v. *Earth Elements, Inc., supra,* 59 Cal.App.4th at p. 970.)

■ South Bay contends it demonstrated GMAC engaged in a business practice likely to deceive the public. Specifically, South Bay characterizes as "fraudulent as a matter of law" GMAC's allegedly deceptive practices of using "per annum" language in its wholesale security agreement, quoting annual interest rates without disclosing its use of the 365/360 method of interest calculation, and thus charging annual rates effectively higher than its quoted rates. (*Chern, supra,* 15 Cal.3d at p. 876.)[25] However, as discussed, *Chern* and its progeny *Fletcher, supra,* 23 Cal.3d 442, are factually distinguishable from the situation here. Indeed, each of those cases contemplates

---

[25]As noted, in *Chern, supra,* 15 Cal.3d 866, the Supreme Court concluded that ". . . the practice of quoting as a 'per annum' rate interest computed on the basis of a 360-day year is likely to mislead and deceive a bank's potential borrowers . . . ." (*Id.* at p. 876.)

section 17200 may not be violated under circumstances where, as here, both the lender and borrower know, understand, agree and expect that the 365/360 method of interest calculation will be used. (*Fletcher, supra,* at p. 446; *Chern, supra,* at pp. 873-875.) On this evidentiary record, the trial court properly rejected South Bay's contention that the absence of an explicit disclosure of the interest calculation method in the parties' wholesale security agreement compelled a finding GMAC was liable as a matter of law.

As discussed, substantial evidence indicated the parties' wholesale floor plan financing contractual relationship consisted not only of the terms of their wholesale security agreement but also included terms specified in the parties' oral and written communications, terms contained in various other written materials GMAC provided to South Bay, and terms established through the parties' course of dealing. As also discussed, South Bay's expert Ross acknowledged there was nothing inappropriate about a lender calculating interest under the 365/360 method if the borrower was made aware of such practice. Evidence indicated South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the 365/360 method to calculate interest. Thus, based on this evidentiary record, the trial court properly rejected the theory alleged in South Bay's complaint that without contractual authorization or disclosure GMAC quoted one interest rate on its wholesale floor plan loans and then charged another rate. The court then properly concluded GMAC's use of the 365/360 method to calculate interest in the context of its wholesale floor plan financing was contractually authorized and did not violate section 17200.

In sum, under these circumstances, South Bay did not demonstrate that GMAC engaged in any business practice with respect to use of the 365/360 method of interest calculation likely to deceive South Bay or other members of the intended audience of reasonable GMAC-financed automotive dealerships. (*Committee on Children's Television, Inc.* v. *General Foods Corp., supra,* 35 Cal.3d at p. 214.) On the contrary, evidence indicated that by various means of disclosure GMAC informed South Bay and other dealerships that it would use the 365/360 method and South Bay, for one, understood accordingly. Hence, on this record the trial court properly found GMAC's use of the 365/360 method was not "deceptive, misleading or fraudulent" as to South Bay within the meaning of section 17200.

(e)

*No Violation of Section 17500*

 "[U]nfair, deceptive, untrue or misleading advertising" under section 17500 constitutes the fourth prong of section 17200. As discussed, one

theory propounded by South Bay for GMAC's asserted liability under section 17200's first prong of "unlawfulness" was that GMAC's alleged improper use of the 365/360 interest calculation method violated section 17500 under the authority of *Fletcher, supra,* 23 Cal.3d 442, and *Chern, supra,* 15 Cal.3d 866. However, as we have explained, those cases are factually distinguishable from this situation where borrower South Bay entered into the disputed loan agreements knowing, understanding, agreeing and expecting that GMAC would use the 365/360 method to calculate interest. Here, GMAC's use of the 365/360 method was disclosed to South Bay and contractually authorized by South Bay. Under these circumstances, the trial court properly concluded GMAC's communications to South Bay about interest rates and charges did not constitute misleading advertising under section 17500.

### (f)

### *Conclusion*

With respect to its individual claim against GMAC under section 17200, South Bay did not prove the theory alleged in its complaint that GMAC engaged in a business practice of using the 365/360 method of interest calculation "without specific contractual authorization and disclosure." Hence, on this evidentiary record the trial court reasonably concluded that GMAC's use of the 365/360 method as to South Bay was not "unlawful," "unfair," "fraudulent," or in violation of section 17500 within the meaning of section 17200. Thus, the portion of the judgment favoring GMAC on South Bay's individual claim under section 17200 must be affirmed.

### B

### *South Bay's Private Attorney General Claim*

South Bay launches several attacks against the portion of the judgment granting GMAC's motion for judgment under Code of Civil Procedure section 631.8 on South Bay's private attorney general claim under section 17200. South Bay contends the trial court granted such motion without considering deposition evidence submitted by South Bay. South Bay also contends the court denied the motion by proceeding on the assertedly erroneous legal premise that to prevail on its private attorney general claim, South Bay would be required to prove the likelihood of deception with respect to each California dealership obtaining wholesale floor plan financing from GMAC. South Bay further contends the court improperly ignored the remedies of injunction, restitution and disgorgement assertedly available

on its private attorney general claim. However, we conclude the court properly granted judgment favoring GMAC on South Bay's private attorney general claim.

1

*Trial Court's Findings*

In granting judgment favoring GMAC on South Bay's private attorney general claim under section 17200, the trial court determined South Bay failed to meet its evidentiary burden to show that its individual claim should be afforded private attorney general status. Specifically, the court stated South Bay did not offer any evidence to establish that any dealership was likely to be deceived or that GMAC-financed dealerships were similarly situated as to their likelihood of deception. The court concluded "there are numerous and disparate ways that dealerships could come to understand that GMAC uses the 365/360 method either before initiating floor plan financing with GMAC or during the ongoing series of loan transactions with GMAC. In order to determine the likelihood of deception, it would be necessary to hold mini-trials into the sophistication of each dealership's practice of checking GMAC's billing statements for accuracy, and the oral, written and implied terms of each loan contract of each dealership. In such circumstances, the representative action plaintiff seeks to bring here is not appropriate and could not be efficiently tried."

The court further concluded there was no evidentiary basis for restitution, disgorgement or injunctive relief under section 17200 since South Bay did not show "actual deception or likelihood of deception in connection with any of the business practices or transactions at issue." The court also stated the record afforded no basis for a finding that "any of the interest received by GMAC from California dealerships was ill-gotten or the result of any actual or likely deception."

The following findings set forth in the court's statement of decision supported the court's conclusions:

Each separate wholesale floor plan loan extended to a California automotive dealership by GMAC was governed by the terms of GMAC's wholesale security agreement with the dealership, terms specified in oral and written communications between GMAC and the dealership's personnel, terms contained in various other written materials GMAC provided to the dealership, and terms established through the course of dealing between GMAC and the dealership;

GMAC and General Motors provided dealerships with various documents disclosing GMAC's use of the 365/360 method of interest calculation

through explicit statements or implicit examples; those documents included billing statements, guides to billing statements, information about GMAC's wholesale plan programs, and individualized materials sent from GMAC's branch offices to selected dealerships; during the 1980's GMAC provided large groups of dealerships with periodically updated monthly billing statements and guides to those billing statements containing sample billing statements; by reviewing those guides and monthly billing statements received from GMAC, a dealership could determine how GMAC calculated interest on its wholesale floor plan financing; and a GMAC-financed dealership could not check the accuracy of the interest charges on its monthly billing statements without understanding the 365/360 method of interest calculation;

However, the owners and personnel of dealerships varied "in sophistication, backgrounds, experience, financing knowledge, training, and familiarity with interest calculation methods"; further, the dealerships' numerous separate wholesale floor plan loan agreements did not contain the same terms or language; dealerships did not receive identical materials from GMAC about its interest calculation method; GMAC had separate and different oral discussions with dealerships about its interest calculation method; and dealerships did not always share a similar course of dealing with GMAC; and

References in GMAC's communications to "per annum" interest rate and to "true interest" were not inconsistent with GMAC's use of the 365/360 method in the context of its wholesale floor plan financing; and a "reasonable dealership would be less likely to be deceived than a member of the general public in connection with a lender's use of the 365/360 method based on the ongoing nature of a dealer's interaction with its lender, the fact that dealers typically employ business staffs that prepare monthly financial statements and review wholesale billing statements, the variety of documents and contexts which would expose a dealership to the 365/360 method, and the common dealership business practices that could not be completed without understanding the method of calculation used by its lender."

2

*Analysis*

(a)

*Timing of Ruling on South Bay's Private Attorney General Claim*

South Bay contends the trial court prematurely granted GMAC's motion under Code of Civil Procedure section 631.8 on South Bay's private attorney

general theory before reading South Bay's deposition designations. South Bay asserts its deposition designations included important evidence by six witnesses including the testimony of Jones, GMAC's vice-president responsible for the wholesale security agreement, that "per annum" meant the annual cost of debt and he did not know why there was no disclosure of GMAC's use of the 365/360 method in the wholesale security agreement; and the testimony of McSheffrey, GMAC's controller's office's most knowledgeable person with respect to the wholesale security agreement and monthly billing statements, that she did not know of any document disclosing or authorizing GMAC's use of the 365/360 method. Asserting deposition designations at trial should be treated as if the deponents were live witnesses (Code Civ. Proc., § 2025, subd. (u)), South Bay claims entitlement to a new trial based on the court's failure to hear those six deponent/witnesses until after ruling for GMAC on South Bay's private attorney general claim.

However, on May 27, 1997, when the court heard argument and initially ruled on GMAC's motion under Code of Civil Procedure section 631.8, South Bay did not object that its deposition designations had not yet been reviewed by the court or otherwise present any argument based on those deposition designations. Hence, South Bay may be deemed to have waived such issue for appeal. (Evid. Code, § 354.) In any event, on July 7, 1997, when entering its statement of decision, the court had received the deposition designations into evidence, reviewed them in detail, and determined that its preliminary ruling favoring GMAC should stand. Indeed, the court began its statement of decision as follows: "Based on the testimony and the evidence received in the trial of this action, the Court finds in favor of defendant [GMAC] and against plaintiff [South Bay] on the issues in plaintiff's complaint." Similarly, the court wrote later in its statement of decision: "Based on the evidence presented in plaintiff's case in chief and pursuant to the standard applicable to GMAC's § 631.8 motion, the Court finds that South Bay's claims should not proceed as a private attorney general action." In the same vein, the judgment entered on July 14, 1997, stated the court granted GMAC's motion to dismiss South Bay's private attorney general claim "after hearing all of the evidence presented by South Bay Chevrolet on the complaint and after hearing argument from both parties on GMAC's motion for judgment . . . ." Moreover, South Bay has not shown any prejudice resulting from the court's reading South Bay's deposition designations only after preliminarily ruling in GMAC's favor on South Bay's private attorney general claim. Indeed, those deposition designations revealed that McSheffrey identified various examples of disclosure documents and, as noted by the court, Jones indicated the 365/360 interest calculation method was not part of his job.

In sum, South Bay has not established any reversible error with respect to the timing of the trial court's reading of South Bay's deposition designations.

(b)

*South Bay's Private Attorney General Claim Was Properly Denied*

South Bay contends the trial court proceeded on the assertedly erroneous legal premise that to prevail under section 17200 South Bay was required to prove through "mini-trials" the likelihood of deception with respect to each borrower. South Bay asserts a plaintiff need not prove the likelihood of deception for purposes of the "unlawful" and "unfair" prongs of section 17200. South Bay also asserts that under section 17200 it was not required to identify specific victims (*ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1270 [61 Cal.Rptr.2d 112, 931 P.2d 290]; *People* v. *Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330, 339-344 [3 Cal.Rptr.2d 34]) or submit individualized proof of deception, reliance or injury as to other borrowers (*ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp., supra,* at pp. 1269-1270; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1267; *Fletcher, supra,* 23 Cal.3d at pp. 449-454.) However, on this record the court properly concluded South Bay did not meet its burden to establish that GMAC's financed dealerships were similarly situated as to their likelihood of deception by GMAC's business practices involving use of the 365/360 method or that any GMAC-financed dealership would likely be deceived by such practices.

As discussed, with respect to its individual claim against GMAC under section 17200, South Bay failed to establish GMAC's business practices in using the 365/360 method was unlawful, unfair, fraudulent, or in violation of section 17500. In essence, the trial court concluded South Bay did not prove the theory alleged in its complaint that GMAC violated section 17200 by using the 365/360 method to calculate interest owing from South Bay "without specific contractual authorization and disclosure." The court's conclusion was supported by substantial evidence that when requesting the disputed wholesale floor plan loans South Bay knew, understood, agreed and expected that GMAC would use the 365/360 method. Like its individual claim, South Bay's private attorney general claim was based expressly on the theory that GMAC violated section 17200 by using the 365/360 method to calculate interest owing from other California dealerships allegedly "without specific contractual authorization and disclosure." However, South Bay failed to prove such allegation on either its individual claim or its private attorney general claim.

With respect to South Bay's private attorney general claim, the evidentiary record indicated GMAC did not engage in uniform disclosure practices about the interest calculation method with all GMAC-financed dealerships; specifically, dealerships did not always share a similar course of dealing with GMAC; GMAC gave dealerships a variety of information about its use of the 365/360 method but not all such dealerships received identical materials; further, GMAC had separate and differing oral discussions with dealerships about its interest calculation method; the dealerships' numerous separate floor plan agreements with GMAC did not contain the same terms or language; and the dealerships' levels and types of experience and sophistication differed. The record also contained evidence indicating that, similar to South Bay, other dealerships when requesting loans from GMAC knew, understood, agreed and expected that GMAC would use the 365/360 method of interest calculation. Indeed, acknowledging that various borrowers were more sophisticated than others, South Bay's expert Ross testified some borrowers understood and expected GMAC's "per annum" rates to be annualized on a 360-day year. In sum, the evidentiary record showed that there was no uniformity in GMAC's contacts with GMAC-financed dealerships, but instead numerous disparate ways for those dealerships to come to understand GMAC used the 365/360 method.

Based upon such substantial evidence, the trial court reasonably found nothing to support a conclusion that GMAC-financed California dealerships were similarly situated with respect to the likelihood of deception by GMAC's business practices involving use of the 365/360 method to calculate interest. Similarly, the court reasonably found nothing to support a conclusion that GMAC's statewide business practices were otherwise unlawful, unfair, fraudulent or in violation of section 17500. Hence, the court properly determined it could not make any determination that GMAC was liable statewide.

Further, as the trial court correctly stated, neither *Fletcher, supra,* 23 Cal.3d 442, nor *Chern, supra,* 15 Cal.3d 866, compels a contrary conclusion.[26] As discussed, in *Chern,* the Supreme Court affirmed a defense summary judgment on plaintiffs' claim for damages for breach of contract

---

[26]In its statement of decision, the trial court indicated: "*Chern* and *Fletcher* do not support plaintiff's claim that relief should be awarded to GMAC-financed dealerships in a private attorney general action. Unlike those class actions where plaintiffs brought suit on behalf of a group of similarly-situated borrowers, this is not a class action and plaintiff has not demonstrated that dealerships are similarly-situated. Because GMAC provides a variety of oral and written explanations to dealerships of its method of computing interest, the Court cannot evaluate likelihood of deception without mini-trials into each dealership's state of mind, the information it received, its practice of reviewing information from GMAC, its level

because the plaintiff knew at the time she entered into the loan contract that the interest rate was calculated under the 365/360 method. (15 Cal.3d at p. 873.) In rejecting the contention by the plaintiff in *Chern* that she should be permitted to represent the class on its breach of contract claim despite her own inability to prevail on the merits, the Supreme Court also upheld dismissal of the class action claim for breach of contract for want of a proper representative. (*Id.* at p. 874.) Similarly, the trial court here could reasonably reject South Bay's private attorney general claim under section 17200 for want of a proper representative. Moreover, as discussed, *Chern* was not inconsistent with the trial court's holding favoring GMAC on South Bay's individual claim under section 17200 for the assertedly unlawful business practice of using the 365/360 method to calculate interest allegedly without specific contractual authorization and disclosure. Similarly not inconsistent with *Chern* was the trial court's holding favoring GMAC on South Bay's private attorney general unlawfulness claim based on the alleged lack of specific contractual authorization and disclosure. As discussed, with respect to South Bay's individual claim, such allegation in South Bay's complaint was contravened by substantial evidence. With respect to South Bay's private attorney general claim, such pleaded allegation was devoid of substantial evidentiary support that anyone was actually misled or likely to be misled by GMAC's conduct so as to be induced to enter into a loan transaction with GMAC; and such allegation was also belied by ample evidence that South Bay and at least some other California dealerships understood or were likely to understand GMAC used the 365/360 method. (15 Cal.3d at pp. 875-876.) Finally, although the Supreme Court in *Chern* permitted the plaintiff to pursue a claim for injunctive relief under section 17500 since the public was presumably likely to understand that a per annum rate was an annual rate based on a 365-day calendar year in the absence of evidence to the contrary, any such presumption of likely deception was dispelled here by GMAC's evidence that the targeted public of GMAC-financed automotive dealerships had information necessary to understand that GMAC used the 365/360 method to calculate interest. (*Chern, supra,* at p. 874.)

With respect to its private attorney general claim, South Bay's reliance on *Fletcher, supra,* 23 Cal.3d 442, is also unavailing. As discussed, in *Fletcher,* the Supreme Court effectively reaffirmed the portion of *Chern, supra,* 15 Cal.3d 866, that a plaintiff, such as South Bay, with full knowledge of the meaning of the per annum interest rate in a contract provision may not prevail in a breach of contract action. (*Fletcher, supra,* at pp. 446, 448.) In

of sophistication, and the quality and abilities of the people at the dealership actually managing the wholesale floor plan."

*Fletcher,* the Supreme Court observed that in *Chern,* "since plaintiff herself could muster no valid contract claim, we concluded that she could not properly pursue a class action on behalf of those borrowers who did not have knowledge of the banking practice." (*Fletcher, supra,* at p. 448.) In *Fletcher* the Supreme Court went further by concluding that even though the plaintiff did not know that interest would be calculated when entering the loan transaction with the defendant bank, the trial court nevertheless acted within its discretion in declining to permit the plaintiff's contract claim to proceed as a class action. (*Id.* at pp. 446, 448-449.) The Supreme Court expressly recognized that "proof of each individual borrower's lack of knowledge may be required to sustain a recovery under the breach of contract theory." (*Id.* at p. 446.) Although styled as a cause of action under section 17200, the essence of South Bay's private attorney general claim against GMAC was the alleged lack of contractual authorization and disclosure, an allegation devoid of substantial evidentiary support and indeed belied by other ample evidence. As discussed, this evidentiary record demonstrated there was no uniformity in GMAC's contacts with GMAC-financed dealerships but instead numerous disparate ways for those dealerships to come to understand GMAC used the 365/360 method. Based upon such evidence, the trial court here acted within its discretion acknowledged in *Fletcher* in properly concluding that California GMAC-financed dealerships' means of learning about the 365/360 method of interest calculation were not sufficiently uniform to allow representative treatment and thus any factual findings about statewide dealership knowledge would require presentation of evidence about each dealership's individual understanding based upon the unique disclosures received by such dealership and the written, oral and implied terms of the dealership's loan agreements with GMAC. (23 Cal.3d at p. 454; see also *Caro* v. *Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655 [22 Cal.Rptr.2d 419]; *Bronco Wine Co.* v. *Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 719-721 [262 Cal.Rptr. 899].) Hence, contrary to South Bay's contention, *Fletcher* is not inconsistent with the trial court's holding favoring GMAC on South Bay's private attorney general claim under section 17200 for the assertedly unlawful business practice of using the 365/360 method of interest calculation allegedly without specific contractual authorization and disclosure.[27]

---

[27]As noted, although affirming the portion of the trial court order dismissing the class action for breach of contract in *Fletcher,* the Supreme Court reversed the portion of the order dismissing the class action for restitution under section 17535. (*Fletcher, supra,* 23 Cal.3d at p. 455.) The Supreme Court stated that "*once an unfair trade practice has been established, a trial court has discretion to order restitution without requiring proof of each class member's lack of knowledge as to that unfair trade practice*" (*id.* at p. 449, italics in original, underscoring added) and the trial court possesses such authority "in order to preclude an entity which

(c)

*Availability of Remedies of Injunction, Restitution and Disgorgement*

Asserting GMAC continues to provide dealerships with the wholesale security agreement and interest rate notices without disclosing that it uses the 365/360 method of interest calculation or that such method results in an effective annual interest rate higher than its quoted rate, South Bay contends even if it did not suffer injury it could properly bring a private attorney general claim on behalf of others. (*Stop Youth Addiction, Inc.* v. *Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558-559, 561-562, 572 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *Saunders* v. *Superior Court, supra,* 27 Cal.App.4th at p. 839.) Specifically, characterizing section 17203 as granting "extraordinarily broad" remedial powers for violations of section 17200, South Bay contends the trial court improperly prejudged and ignored the availability of injunctive relief on its private attorney general claim by stating before hearing evidence that ". . . there is no action for injunctive relief before us, it is merely a matter of restitution or disgorgement." (*Hewlett* v. *Squaw Valley Ski Corp., supra,* 54 Cal.App.4th at p. 540.) South Bay also contends the trial court improperly and prejudicially failed to consider the availability of restitution and disgorgement as relief on its private attorney general claim. However, South Bay's contentions involving remedies miss the point.

Entitlement to the statutory remedies of injunction, restitution and disgorgement arises only when an unfair trade practice has been established, a situation not present here. (See e.g., *Fletcher, supra,* 23 Cal.3d at p. 449.) As discussed, on this evidentiary record the trial court properly concluded South Bay failed to prove GMAC's use of the 365/360 method was unlawful, unfair, untrue, deceptive, misleading or fraudulent for purposes of section 17200. Further, in its statement of decision, the trial court effectively acknowledged the potential availability of the statutory remedies of injunction, restitution and disgorgement if South Bay had met its evidentiary burden. The court specifically stated: "There is no evidentiary basis for restitution, disgorgement or injunctive relief under the standards of § 17200 because plaintiff failed to show actual deception or likelihood of deception in connection with any of the business practices or transactions at issue. There is no basis in the record for the Court to find that any of the interest received by GMAC from California dealerships was ill-gotten or the result

---

has engaged in an unlawful trade practice from improperly profiting from its wrongdoing" (*id.* at p. 446). However, that portion of *Fletcher* does not require a contrary result here since South Bay has failed to establish GMAC has engaged in an unfair trade practice. .

of any actual or likely deception."[28] Hence, any appellate issues involving potential remedies are meritless or moot.

(d)

*Conclusion*

In sum, as acknowledged by South Bay, the record contained evidence indicating California GMAC-financed automotive dealers varied in financial sophistication, intelligence, attention to detail, educational background and experience, and length of time in business. Further, South Bay made no evidentiary showing to the contrary, to wit, that dealerships statewide were in substantially equivalent contractual relationships with GMAC bearing on use of the 365/360 method of interest calculation, received the same disclosures from GMAC about use of such method, or failed to understand GMAC's statements about such use. On this record, the trial court properly concluded there was no basis for a representative action under the private attorney general theory. Hence, the portion of the judgment granting GMAC's motion under Code of Civil Procedure section 631.8 on South Bay's private attorney general claim must be affirmed.

C

*Challenged Evidentiary Rulings*

1

*Evidence of Other Borrowers' Knowledge of GMAC's Interest Calculation Method*

■ South Bay contends the trial court erroneously and unfairly "whipsawed" South Bay on the subject of other borrowers' knowledge of GMAC's method of calculating interest by granting South Bay's first motion *in limine* to exclude evidence that other borrowers knew GMAC used the 365/360 method and then later ruling against South Bay on GMAC's motion under

---

[28]The record thus belies South Bay's additional contention that the trial court denied restitution and disgorgement on the assertedly unsupported basis that GMAC's borrowers knew GMAC was using the 365/360 method. The court made no finding that nonparty dealerships knew that GMAC used such method. Instead, based upon substantial evidence, the court simply found those nonparty dealerships had uniquely individual dealings with GMAC about the 365/360 method and thus were not similarly situated with respect to their transactions with GMAC or knowledge of such method. Based upon such findings, the court properly concluded South Bay did not prove any uniformity of business practice violating section 17200 whether unlawful, unfair, fraudulent, misleading or otherwise.

Code of Civil Procedure section 631.8 for failing to prove other borrowers' lack of knowledge of GMAC's use of such method. However, on this record South Bay has not established any error in the court's granting South Bay's first motion *in limine*.[29]

(a)

### The Record

South Bay's first motion *in limine* sought to exclude as assertedly irrelevant, hearsay and inherently unreliable certain specific evidence proffered by GMAC consisting of "acknowledgments" by several hundred California dealerships indicating their awareness that GMAC used the 365/360 method of interest computation. The trial court granted South Bay's first motion *in limine*. The court stated: "What other people know or knew has no bearing on what the plaintiff knows or knew, or should have known. Whether everyone else in the world was informed, I guess the evidence doesn't have any effect on someone who is uninformed and who is damaged by the conduct. [¶] So the dealer acknowledgments would not be admitted into evidence."

South Bay's third motion *in limine* sought to exclude evidence that certain dealerships or their employees knew that GMAC was using the 365/360 method. The court denied South Bay's third motion *in limine*. The court stated: "Number three was the issue of knowledge. I think it's, that we have already discussed on telephonic. The evidence of knowledge is relevant, is admissible, is required to establish proof in this case. And it is the issue."[30]

South Bay's ninth motion *in limine* sought to exclude from evidence any opinion testimony based on the dealership "acknowledgments" proffered by GMAC. The court granted in part South Bay's ninth motion *in limine*. The court stated: "The ninth kind of mirrors number one regarding the dealer acknowledgments. The question is whether these can be referenced. I have previously held that I would not receive them in direct evidence for a

---

[29]Moreover, if there were any such error, it was invited by South Bay.

[30]In later recounting its telephonic discussion of South Bay's third motion *in limine*, the court stated: "I addressed the fact that knowledge was, indeed, a relevant issue in this case. That the knowledge of every person involved in dealing with G.M.A.C., their level of sophistication, the measure of information they had received, the quality of the person actually managing the financing of the business and most similar corporations all are relevant to the issues in the case. [¶] It would be necessary to show the knowledge, state of mind, the information received, the sophistication of each dealer in order to decide whether or not the practice we are talking about here was likely to deceive or are [*sic*] relevant to the issue in the case."

number of reasons. [¶] It does appear in motion *in limine* number nine, this information may be used by experts. I'm not quite sure how. It is the type of information that can be used by experts, and I would permit it to be used in that regard. Otherwise, I would grant the motion to use it to be consistent with the ruling on number one because I do believe it is, the documents, the collection of information, is hearsay, for one; but, it may be usable as reference by experts and it is possible it could be relevant to some impeachment. But, basically, I would grant the motion excluding the dealer acknowledgments except for the limitations regarding experts and impeachment."

(b)

*Analysis*

As discussed, contrary to South Bay's contention, whether other borrower/dealerships lacked knowledge of GMAC's use of the 365/360 method was relevant to proving the allegation in South Bay's private attorney general claim that GMAC violated section 17200 by using such method to calculate interest on those dealerships' loans without specific contractual authorization and disclosure. Further, in granting South Bay's first motion *in limine*, the court did not preclude South Bay from presenting evidence that other dealerships lacked knowledge of GMAC's use of the 365/360 method. Instead, the court simply excluded the dealership acknowledgments submitted by GMAC as evidence showing other dealerships knew GMAC used such method. Indeed, in denying South Bay's third motion *in limine*, the court expressly indicated evidence of other dealerships' knowledge was admissible and required as relevant to establishing proof of South Bay's case. Moreover, in responding to GMAC's interrogatories, South Bay did not identify any GMAC-financed dealership lacking knowledge of GMAC's use of the 365/360 method. Finally, at trial South Bay never sought to offer any evidence of other dealerships' lack of knowledge about GMAC's use of such method.[31]

In sum, on this record South Bay has not demonstrated error with respect to the court's granting South Bay's first motion *in limine*.

---

[31]In announcing its intended ruling to grant GMAC's motion under Code of Civil Procedure section 631.8 on South Bay's private attorney general claim, the trial court stated: "I cannot accept the fact that this evidence that we have before us at this point can possibly be sufficient to prove that every dealer in the state was deceived or any dealer in the state was deceived besides South Bay Chevrolet." The court further stated: "If the defendant turns around and proves that all of the other dealers were in the same boat and had the same knowledge as South Bay, then, of course, it may be—there may be evidence that would prove the matter. I don't think they are going to do it. [¶] It puts the burden on the plaintiff to establish that the other parties similarly situated were in fact similarly situated and undoubtedly had the same knowledge or lack of knowledge that South Bay dealt with it. I did not find that there's any evidence to support that."

2

*Admission of Extrinsic Evidence on Meaning of "Per Annum"*

South Bay contends the trial court erred in denying its fourth motion *in limine* to exclude extrinsic evidence assertedly varying the wholesale security agreement, the plain meaning of the term "per annum," and GMAC's interest rate notices. South Bay contends it was prejudiced by denial of its fourth motion *in limine* in that the court's ultimate decisions favoring GMAC assertedly rested on alleged disclosures shown by extrinsic evidence.[32] However, the court properly denied South Bay's fourth motion *in limine* since extrinsic evidence was relevant on the truth of South Bay's allegation that GMAC violated section 17200 by using the 365/360 method without specific contractual authorization and disclosure.

(a)

*The Record*

South Bay's fourth motion *in limine* sought to exclude the use of extrinsic evidence to expand the terms of the contract at issue. The trial court denied South Bay's fourth motion *in limine*. The court stated: "This is, as it stands, not really a contract case. Although to some extent it kind of feels and smells like it, but, the extrinsic evidence is certainly relevant to the issue of knowledge. The extrinsic evidence that can be shown that even in handling the matters of computing the payments, the amounts due, other disclosures that were made over the years surrounding the use of the system, certainly as to South Bay Chevrolet would be relevant *and the motion to exclude that, any evidence would be denied, subject to objections that might be made from time to time in specific instances and along the way which may change that. But there are certainly no blanket exceptions.*" (Italics added.)

(b)

*Analysis*

On this record South Bay has not established error with respect to denial of its fourth motion *in limine*. Contrary to South Bay's contention, extrinsic

---

[32]For example, South Bay's former business manager, Fenn, testified that "true" interest was the same as simple or noncompound interest and that use of the word "true" did not confuse her into believing that GMAC was using any calculation method other than 365/360. As noted, in its statement of decision, the trial court concluded that references in the wholesale security agreement and other GMAC materials to "per annum" interest rate and "true interest" were not inconsistent with use of the 365/360 method in the context of GMAC's wholesale floor plan financing; and in South Bay's wholesale "floor plan loan contracts, GMAC was authorized to use the 365/360 method and references to 'per annum' interest were, by agreement of the parties, made with reference to a 360-day interest year."

evidence could not vary any term of the parties' wholesale security agreement involving the interest calculation method since that agreement did not contain any such term. Further, as noted, the wholesale security agreement was not the only document bearing on the parties' contractual relationship and, indeed, such agreement expressly incorporated the GMAC wholesale plan. Moreover, extrinsic evidence was admissible to explain the entirety of the parties' contractual arrangement including the wholesale security agreement since such evidence was "relevant to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 20 [22 Cal.Rptr.2d 229].)[33] Finally, in denying South Bay's fourth motion *in limine*, the trial court expressly indicated South Bay was not precluded from objecting at trial to specific extrinsic evidence. Having failed to do so, South Bay has not demonstrated error with respect to admission of any extrinsic evidence.

3

*Admission of Azevedo's Testimony*

South Bay contends the trial court erred in admitting the testimony of GMAC's employee Azevedo over objections that (1) GMAC did not properly or timely disclose Azevedo as a witness to communications between GMAC and South Bay, and (2) Azevedo's testimony was irrelevant and based not on recollection but on improper supposition from her general practices. South Bay contends it was prejudiced by such assertedly erroneous evidentiary ruling since the court ultimately cited and relied on Azevedo's

---

[33]In *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.*, *supra*, 69 Cal.2d 33, the Supreme Court stated: "The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. [Citations.] [¶] *A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained.*" (*Id.* at p. 37, italics added.)

In *Hayter Trucking, Inc. v. Shell Western E&P, Inc.*, *supra*, 18 Cal.App.4th 1, the appellate court observed that ". . . the traditional parol evidence rule allowed extrinsic evidence to give meaning to a writing only when the writing was ambiguous. In 1968, the California Supreme Court liberalized the traditional rule by rejecting the 'plain meaning rule.' Hence, extrinsic evidence relevant to interpretation can no longer be barred simply because of a judicial determination that a writing appears to have only one interpretation. [Citations.] Parol evidence is now admissible to show mutually shared meanings of words used irrespective of their ordinary meaning. [Citation.] *Most importantly, parol evidence of custom and usage is similarly admissible to interpret the written words.*" (*Id.* at p. 20, italics added.)

testimony- in its statement of decision.[34] However, South Bay has not demonstrated error.

## (a)

### The Record

When GMAC called Azevedo to testify, South Bay objected on the ground that GMAC had assertedly not disclosed Azevedo as a GMAC employee having conversed with South Bay about GMAC's interest rate calculation method. Noting South Bay had taken Azevedo's deposition a few months before trial and thus "had that opportunity to see what her knowledge and background is," the court stated, "I don't see the unfairness involved."

Azevedo proceeded to testify that within 24 hours after GMAC acquired South Bay's account in June 1986, Azevedo as GMAC's sales supervisor discussed GMAC's interest calculation method with South Bay's office manager or business manager; Azevedo inventoried the vehicles at South Bay's premises, took an invoice to South Bay's business office and said: "Okay, you guys, this is your billing statement that is going to come in. This is what it is going to look like and this is how it will be calculated"; Azevedo then took one of South Bay's invoices and showed South Bay that "this is the amount and based on taking that amount times our interest rate, we are charging you one over prime, divided by 360 over the number of days, that is what would actually be billed to you"; and Azevedo went over calculations and discussed the wholesale billing statement with South Bay to make South Bay aware of it from the outset and to ensure there would not be any questions. At the conclusion of Azevedo's testimony on direct examination, South Bay asked the court to strike Azevedo's responses to the extent "elicited without proper foundation and without proper examination as well." South Bay then cross-examined Azevedo.

## (b)

### Analysis

When South Bay objected that it lacked advance warning of the scope of Azevedo's testimony, the trial court found South Bay was not prejudiced

---

[34]Specifically, in its statement of decision, the trial court wrote: "GMAC's San Diego branch office, which serviced South Bay, has a regular practice of discussing its method of interest calculation with dealerships within 24 hours of when the dealerships sign up for floor plan financing with GMAC. It also was GMAC's practice for its sales staff to explain the calculations on the wholesale billing statements after financing had commenced. GMAC followed this regular procedure and its Sales Supervisor Helen Azevedo orally informed South Bay of its interest calculation methods shortly after South Bay executed the Wholesale Security Agreement in June 1986."

because shortly before trial South Bay had taken Azevedo's deposition with the opportunity to discover her knowledge and background. GMAC also made the court aware that South Bay had listed Azevedo as a witness in the joint disposition conference report. Moreover, a year before trial and well before Azevedo's deposition, in support of its motion for summary judgment GMAC had provided South Bay with Azevedo's declaration suggesting she had discussed GMAC's use of the 365/360 method with South Bay.[35] On this record the court properly rejected South Bay's claim of unfair and prejudicial surprise with respect to Azevedo's testimony and thus correctly permitted Azevedo to testify.

Further, the record reveals that Azevedo testified as to her specific personal recollections of her own experiences with South Bay. Thus, as adequately founded on personal knowledge, such testimony was not impermissible supposition. Moreover, Azevedo's testimony was manifestly relevant to the truth of South Bay's allegation that GMAC violated section 17200 by using the 365/360 method without specific contractual authorization and disclosure.

In sum, South Bay has not established that admission of Azevedo's testimony was error.

4

*Exclusion of Gelfond's Testimony*

South Bay contends the trial court prejudicially erred in excluding as duplicative the testimony of its expert witness, Lawrence Gelfond. South Bay asserts Gelfond's testimony had independent evidentiary value in demonstrating how other lenders disclosed their use of the 365/360 method of interest calculation. However, South Bay has not established error with respect to exclusion of Gelfond's testimony.

(a)

*The Record*

Immediately after the conclusion of its expert Ross's testimony, South Bay called certified public accountant Gelfond as an expert witness. Upon

[35]Specifically, Azevedo's declaration asserted: "From 1971 to 1992 I worked at the GMAC branch office in San Diego, the branch which serviced South Bay Chevrolet. [¶] Between 1986 and 1996, in the course of my duties as a supervisor and manager, I have explained the 365/360 Method to dealership personnel, either in person or over the telephone, on more than 60 occasions. . . . On each of these 60 occasions, my explanation also included an application of the 365/360 formula to data from the dealership's statement of wholesale charges."

reviewing the disposition conference report, the court observed that Gelfond was to testify on the same matters as Ross, to wit, "the nature, purpose, effect, propriety, prevalence and disclosure obligations associated with the 365/360 method." The court stated: "I don't want to hear anything twice. [¶] One expert per field is the rule. If he's covering the same information, I don't want to hear it." During the court's ensuing discussion with counsel, GMAC objected to Gelfond's testimony and South Bay at the court's request made an offer of proof. Specifically, South Bay asserted Gelfond would testify about other lenders' disclosures of their use of the 365/360 method and why GMAC's materials would likely mislead or likely deceive automotive dealerships. South Bay's counsel acknowledged "we are covering ground that Mr. Ross has covered as well . . . ." The court stated: "I haven't heard anything that's covering information that is striking me as new or different. It's the same issue. It's the same area of expertise. The same questions are undoubtedly going to be asked and answered. I believe that it's redundant and we are calling two experts on the same issue." The court then excluded Gelfond's testimony, stating: "I think it was exhaustively pursued with Mr. Ross both on direct and cross and I don't intend to receive any other evidence on it."

### (b)

### Analysis

Evidence Code section 723 provides: "The court may, at any time before or during the trial of an action, limit the number of expert witnesses to be called by any party." On this record, the trial court acted within its discretion in excluding Gelfond's testimony as cumulative. As the court properly observed, South Bay's designation of expert witnesses indicated the scope of Gelfond's anticipated testimony was a "duplicate" of the subject matter covered by Ross. Further, South Bay's counsel acknowledged that "there's a substantial overlap" in the two experts' testimony and that Gelfond's testimony would be covering ground already covered by Ross. ·

In sum, South Bay has not established that exclusion of Gelfond's testimony was error.

### D

### Denial of South Bay's Motion for Summary Judgment

Asserting it demonstrated as a matter of law that GMAC's "undisputed practices" violated section 17200, South Bay contends the superior court erroneously denied its motion for summary judgment. South Bay contends

the court's "sketchy" ruling denying such motion assertedly did not comply with Code of Civil Procedure section 437c, subdivision (g), and prejudiced South Bay by indicating with respect to liability not that South Bay failed to show the elements of its claims but instead that South Bay failed to show the absence of an "unspecified defense."[36] However, on this record South Bay has not established prejudice resulting from any error in the denial of its summary judgment motion. (*Waller* v. *TJD, Inc.* (1993) 12 Cal.App.4th 830, 833-836 [16 Cal.Rptr.2d 38] (*Waller*); see also *Reid* v. *Balter* (1993) 14 Cal.App.4th 1186, 1195 [18 Cal.Rptr.2d 287].)

In *Waller, supra,* 12 Cal.App.4th 830, although "cognizant of the fact that California cases have frequently indicated, as a general proposition, that an order denying a motion for summary judgment, while not directly appealable, may be reviewed on appeal from the final judgment," the appellate court declined a request "to consider the merits of the order denying summary judgment as a basis to reverse a judgment entered after trial on the merits." (*Id.* at p. 836.) In an opinion "limited to situations in which a party moves for summary judgment on the ground that there is no triable issue of fact, the motion is denied, and the same questions raised by the motion are then decided adversely to the unsuccessful moving party after a trial on the merits which is itself free from prejudicial error" (*ibid.*), the appellate court concluded that "even if the superior court erred in denying summary judgment, that error cannot result in reversal of the final judgment unless that error resulted in prejudice to defendant" (*id.* at p. 833).

In *Waller, supra,* 12 Cal.App.4th 830, the defendant sought to establish the requisite prejudice by contending that "if its summary judgment motion had been granted, the matter would have been terminated in its favor at that point, there would have been no trial and it would not now be faced with an adverse judgment." (*Id.* at p. 833.) However, the appellate court rejected the "defendant's theory that merely being compelled by force of an erroneous denial of a dispositive pretrial motion to participate in an otherwise fair trial constitutes prejudice warranting reversal." (*Id.* at p. 834.) The appellate court stated: "When the trial court commits error in ruling on matters relating to pleadings, procedures, or other preliminary matters, reversal can generally be predicated thereon only if the appellant can show resulting prejudice, and the probability of a more favorable outcome, *at trial.* Article VI, section 13, [of the California Constitution] admonishes us that error may lead to reversal

---

[36]In denying South Bay's motion for summary judgment, the superior court stated South Bay "failed to meet its initial burden under CCP Section 437(c), subsection [(o)(1)] of showing that [there was] no defense to the sole cause of action alleged in the complaint pursuant to Business and Professions Code Section 17200, and Plaintiff has failed to establish the amount of restitution prayed for."

only if we are persuaded 'upon an examination of the entire cause' that there has been a miscarriage of justice. In other words, we are not to look to the particular ruling complained of in isolation, but rather must consider the full record in deciding whether a judgment should be set aside. Since we are enjoined to presume that the trial itself was fair and that the verdict in plaintiffs' favor was supported by the evidence, we cannot find that an erroneous pretrial ruling based on declarations and exhibits renders the ultimate result unjust." (*Id.* at p. 833, italics in original.)

Similarly, on this record we cannot find that the ruling denying South Bay's summary judgment motion, even if erroneous, rendered unjust the judgment entered after full trial on the merits. (*Waller, supra,* 12 Cal.App.4th at pp. 833-836.) South Bay has not identified any prejudice at trial resulting from denial of its motion for summary judgment. South Bay has not demonstrated the judgment rendered after trial on the merits is "insupportable." (*Id.* at p. 836.) Hence, since "we are unable to determine just how, if at all," South Bay was actually prejudiced at trial by the court's denial of its summary judgment motion, we cannot conclude such assertedly erroneous ruling "rendered the ultimate result in this case unjust." (*Reid* v. *Balter, supra,* 14 Cal.App.4th at p. 1195;[37] *Waller, supra,* at pp. 833-836.) Further, for the same reasons that any error in denial of South Bay's summary judgment motion was not prejudicial, it is "obvious" that any asserted "technical deficiency" in the order denying such motion was "also inconsequential at this stage of the proceedings." (*Waller, supra,* at p. 836.)[38] Hence, we do not disturb the judgment.

E

*Costs Awarded by Trial Court*

GMAC filed a memorandum of costs claiming $117,763.58 costs under Code of Civil Procedure sections 1032 and 1033.5. GMAC submitted a detailed memorandum of costs verified by one of its trial attorneys and the declaration of another of its trial attorneys who contemporaneously reviewed all costs and expenses incurred by GMAC in this litigation. South Bay

---

[37]Citing *Waller, supra,* 12 Cal.App.4th 830, the appellate court stated in *Reid* v. *Balter, supra,* 14 Cal.App.4th 1186: "When an appeal is taken from a judgment and the appellant alleges the trial court made an erroneous pretrial ruling, it is not enough to show that the ruling was indeed erroneous. In addition, the appellant must also 'show resulting prejudice, and the probability of a more favorable outcome, *at trial.*' " (*Reid* v. *Balter, supra,* at p. 1195, italics in original.)

[38]In *Waller, supra,* 12 Cal.App.4th 830, the appellant/defendant contended ". . . the superior court erred in denying its motion for summary judgment, and that the court failed in its order of denial adequately to state its reasons." (*Id.* at pp. 831-832.)

moved to tax $108,719.36 of the costs claimed by GMAC. After the trial court granted in part and denied in part South Bay's motion to tax costs, GMAC was awarded $83,005.54 costs. South Bay now challenges $73,960.32 of those awarded costs as assertedly not allowable and erroneously not taxed by the court.

South Bay attacks awards of costs for items ranging from $14 motion filing fees to $44,000 for models, blowups, and photocopies of exhibits. Rather than extending an already lengthy opinion, after having examined each disputed cost item we simply state our conclusion that the trial court acted within its discretion in awarding costs as expressly authorized by statute (Code Civ. Proc., §§ 1033.5, subds. (a)(1), (3)-(4), (12), (c)(2)-(4), 2023, subd. (a)(2)-(3); Evid. Code, § 723; former Super. Ct. San Diego County Rules, div. II, rule 1.5.6; see current Super. Ct. San Diego County Rules, div. II, rule 5.12) or as otherwise reasonable and necessary. (*Heller* v. *Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1395 [58 Cal.Rptr.2d 336]; *Thon* v. *Thompson* (1994) 29 Cal.App.4th 1546, 1548 [35 Cal.Rptr.2d 346]; *Goodstein* v. *Bank of San Pedro* (1994) 27 Cal.App.4th 899, 910 [32 Cal.Rptr.2d 740]; *Santantonio* v. *Westinghouse Broadcasting Co.* (1994) 25 Cal.App.4th 102, 121 [30 Cal.Rptr.2d 486]; *Applegate* v. *St. Francis Lutheran Church* (1994) 23 Cal.App.4th 361, 363-364 [28 Cal.Rptr.2d 436]; *Ladas* v. *California State Auto Assn.* (1993) 19 Cal.App.4th 761, 773-774, 776 [23 Cal.Rptr.2d 810]; *Winston Square Homeowner's Assn.* v. *Centex West, Inc.* (1989) 213 Cal.App.3d 282, 293 [261 Cal.Rptr. 605].)

V

DISPOSITION

The judgment is affirmed.

Work, J., and Benke, J., concurred.

A petition for a rehearing was denied May 25, 1999, and appellant's petition for review by the Supreme Court was denied August 25, 1999. Mosk, J., was of the opinion that the petition should be granted.